purpose (the "Components") shall be the currency amounts which were components of the EC ECU when the EC ECU was most recently used in the European Monetary System. However, if the EC ECU is being used for the settlement of transactions by public institutions of or within the EC, or if it was so used after its most recent use in the European Monetary System, the Components shall be (a) the currency amounts that are components of the EC ECU as so used as of the Day of Valuation, or (b) the currency amounts that were components of the EC ECU when it was most recently so used, as the case may be. The equivalent of the ECU in the chosen currency shall be calculated by first aggregating the U.S. dollar equivalents of the Components and then, using the rate used for determining the U.S. dollar equivalent of the Component in the chosen currency as set forth below, calculating the equivalent in the chosen currency of such aggregate amount in U.S. dollars.

The U.S. dollar equivalent of each of the Components shall be determined by the Exchange on the basis of the middle spot delivery quotations prevailing at 2.30 p.m. (local time in the Relevant Financial Centre) on the Day of Valuation, as obtained by the Exchange from one or more leading banks, as selected by the Trustee, in the country of issue of the Component in question.

If the official unit of any component currency is altered by way of combination or subdivision, the number of units of that currency as a Component shall be divided or multiplied in the same proportion. If two or more component currencies are consolidated into a single currency, the amounts of those currencies as Components shall be replaced by an amount in such single currency equal to the sum of the amounts of the consolidated component currencies expressed in such single currency. If any component currency is divided into two or more currencies, the amount of that currency as a Component shall be replaced by amounts of such two or more currencies, each of which shall be equal to the amount of the former component currency divided by the number of currencies into which that currency was divided.

If no direct quotations are available for a Component as of a Day of Valuation from any of the banks selected by the Trustee for this purpose because foreign exchange markets are closed in the country of issue of that currency or for any other reason, the most recent direct quotations for that currency obtained by the Exchange shall be used in computing the equivalents of the ECU on such Day of Valuation, provided, however, that such most recent quotations may be used only if they were prevailing in the country of issue not more than two business days before such Day of Valuation. Beyond such period of two business days, the Exchange shall determine the U.S. dollar equivalent of such Component on the basis of cross rates derived from the middle spot delivery quotations for such component currency and for the U.S. dollar prevailing at 2.30 p.m. (local time in the Relevant Financial Centre) on such Day of Valuation, as obtained by the Exchange from one or more leading banks, as selected by the Trustee, in a country other than the country of issue of such Component. Within such period of two business days, the Exchange shall determine the U.S. dollar equivalent of such Component on the basis of such cross rates if the Trustee judges that the equivalent so calculated is more representative than the U.S. dollar equivalent calculated on the basis of such most recent direct quotations. Unless otherwise specified by the Trustee, if there is more than one market for dealing in any Component by reason of foreign exchange regulations or for any other reason, the market to be referred to in respect of such currency shall be that upon which a non-resident issuer of securities denominated in such currency would purchase such currency in order to make payments in respect of such securities.

All determinations made by each of the Trustee and the Exchange shall be at its sole discretion and shall, in the absence of manifest error, be conclusive for all purposes and binding on the Republic and all Noteholders, Principal Couponholders (if any) and Couponholders.

(g) *Talons*

Except where such Talon has become void pursuant to Condition 7(e)(iv), on or after the Reference Date or, as the case may be, the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Principal Paying Agent in exchange for a further Coupon sheet (but excluding any Coupons which may have become void pursuant to Condition 9).

## 7A. EURO Provisions

### (a) *Definitions*

For the purposes of the Conditions, the following terms shall have the meanings specified herein:

"EMU" means the Economic and Monetary Union as contemplated in the Treaty;

"EMU Date" means the date on which the third stage of EMU has started or events have occurred which have substantially the same effects as those of the third stage of EMU as contemplated by the Maastricht Treaty;

"EURO" means the currency to be introduced within the participating Member States pursuant to the Maastricht Treaty;

"Maastricht Treaty" means the treaty on European Unity which was signed at Maastricht on February 1, 1992 and came into force on November 1, 1993;

"participating Member State" means a member state of the European Community established by the Treaty which adopts the single currency in accordance with the Treaty; and

"Treaty" means the Treaty of Rome of March 25, 1957, as amended by the Single European Act 1986 and the Maastricht Treaty, establishing the European Community, as amended from time to time.

### (b) *General*

References in the Conditions to any business day, day-count fraction or other convention (whether for the calculation of interest, determination of payment dates or otherwise) shall, if different, with effect from the EMU Date, be deemed to be amended to comply with any conventions applicable to EURO-denominated obligations pursuant to applicable requirements of relevant monetary, stock exchange or other authorities, applicable European Community and national laws and regulations and such market practices consistent therewith as the Principal Paying Agent, in its discretion, shall determine to be applicable for such EURO-denominated obligations held in international clearing systems and the Conditions shall be deemed to be amended accordingly.

Upon any change to the Conditions, notice thereof will be given to Noteholders in accordance with the Conditions.

Determinations made by the Principal Paying Agent will, in the absence of manifest error, be conclusive and binding on the Republic and the Noteholders. In the discharge of its duties and responsibilities, the Principal Paying Agent is acting in its capacity as agent solely of the Republic. The Principal Paying Agent does not have any fiduciary duty towards the Noteholders.

Payments pursuant to Condition 7 shall be made in EURO provided that, before the EMU Date, all payments in respect of the Notes shall be made in ECU at the rate of one ECU for one EURO and all provisions in the Conditions relating to ECU notes shall therefore apply. After the EMU Date, payments will be made by the Principal Paying Agent by a EURO cheque drawn on, or by transfer to a EURO account maintained by the payee with, a bank in a principal financial centre for the payment of Euros.

For the purposes of Condition 7(a), "business day" means a day on which commercial banks and foreign exchange markets are open for business in the relevant place of presentation and which is: (i) in the case of payment in EURO or ECU, a day on which commercial banks and foreign exchange markets are open for business and carrying out transactions in EURO or ECU, as the case may be, in the country of the EURO or ECU account specified by the relevant payee; or (ii) in the case of payment in a chosen currency, a day on which commercial banks and foreign exchange markets are open for business and carrying out transactions in such chosen currency in the principal financial centre of such chosen currency.

## 8. Taxation

All payments in respect of the Notes, the Principal Coupons (if any) and the Coupons will be made free and clear of, and without withholding or deduction for, or on account of, any taxes, duties,

assessments or governmental charges (together, "Taxes") of whatever nature imposed, levied, collected, withheld or assessed by or within the Republic of Argentina or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In such event, the Republic shall pay such additional amounts as will result in receipt by the Noteholders, the Principal Couponholders (if any) or the Couponholders, as the case may be, of such amounts as would have been received by them had no such withholding or deduction been required, except that no such additional amounts shall be payable with respect to any Note, Principal Coupon or Coupon:—

    (i)   in the case of Bearer Notes, Principal Coupons (if any) or Coupons:—

        (1)   to a holder (or to a third party on behalf of a holder) where such holder is liable to such Taxes in respect of such Bearer Note, Principal Coupon or Coupon by reason of it having some connection with the Republic of Argentina other than the mere holding of such Bearer Note, Principal Coupon or Coupon; or

        (2)   presented for payment more than 30 days after the Relevant Date except to the extent that the holder thereof would have been entitled to additional amounts on presenting the same for payment on the last day of such period of 30 days;

    (ii)   in the case of Registered Notes:—

        (1)   to a holder (or to a third party on behalf of a holder) where such holder is liable to such Taxes in respect of such Registered Note by reason of it having some connection with the Republic of Argentina, other than the mere holding of such Registered Note or the receipt of the relevant payment in respect thereof; or

        (2)   if the Definitive Registered Note in respect of such Registered Note is surrendered more than 30 days after the Relevant Date and such surrender is required for payment except to the extent that the holder thereof would have been entitled to additional amounts on presenting the same for payment on the last day of such period of 30 days.

As used in these Conditions, "Relevant Date" in respect of any Note, Principal Coupon or Coupon means the date on which payment in respect thereof first becomes due or (if the full amount of the money payable has not been received by the Trustee or the Principal Paying Agent on or prior to such due date) the date on which notice is duly given to the Noteholders in accordance with Condition 17 that such moneys have been so received and are available for payment. References herein to "principal" shall be deemed to include any premium payable in respect of the Notes and any reference to "principal" and/or "Amortised Face Amount" and/or "premium" and/or "interest" shall be deemed to include any additional amounts which may be payable under this Condition 8.

## 9.  Prescription

Claims against the Republic for payment in respect of the Notes, Principal Coupons (if any) and Coupons (which, for this purpose shall not include Talons) shall be prescribed and become void unless made within 10 years (in the case of principal or, in respect of Interest Only Notes, interest) and five years (in the case of interest, other than in respect of Interest Only Notes) from the appropriate Relevant Date in respect thereof.

## 10.  Events of Default

If any of the following events ("Events of Default") occurs and is continuing:—

    (a)   *Non-Payment*: the Republic fails to pay any principal (or Amortised Face Amount) of any of the Notes when due and payable or fails to pay any interest on any of the Notes when due and payable and such failure continues for a period of 30 days; or

    (b)   *Breach of Other Obligations*: the Republic does not perform or comply with any one or more of its other obligations in the Notes or in the Trust Deed, which default is incapable of remedy or is not remedied within 90 days after notice of such default shall have been given to the Republic by the Trustee; or

(c) *Cross Default*: any event or condition shall occur which results in the acceleration of the maturity (other than by optional or mandatory prepayment or redemption) of any Public External Indebtedness of the Republic having an aggregate principal amount of U.S.$30,000,000 or more, or any default in the payment of principal of, or premium or prepayment charge (if any) or interest on, any such Public External Indebtedness having an aggregate principal amount of U.S.$30,000,000 or more, shall occur when and as the same shall become due and payable, if such default shall continue for more than the period of grace, if any, originally applicable thereto; or

(d) *Moratorium*: a moratorium on the payment of principal of, or interest on, the Public External Indebtedness of the Republic shall be declared by the Republic; or

(e) *Validity*: the validity of the Notes or the Trust Deed shall be contested by the Republic;

then in each and every such case, the Trustee at its discretion may in respect of Notes of any Series, or at the request of Noteholders (including, if the Amortisation Provisions are specified on the face of the Notes as applying to such Notes, the Principal Couponholders) holding not less than 25 per cent. in aggregate principal amount of the Notes of such Series then outstanding, by notice in writing to the Republic shall, declare the principal amount (or Amortised Face Amount) of all the Notes of such Series to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable upon the date that such written notice is received by the Republic unless prior to such date all Events of Default in respect of all the Notes of such Series shall have been cured; provided that in the case of Conditions 10(b), (d) and (e) the Trustee shall have certified that in its opinion such event is materially prejudicial to the interests of the Noteholders and provided further, that if, at any time after the principal (or Amortised Face Amount) of the Notes of such Series shall have been so declared due and payable, and before any sale of property under any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Republic shall pay or shall deposit with the Trustee a sum sufficient to pay all matured amounts of interest and principal (or Amortised Face Amount) upon all the Notes of such Series which shall have become due otherwise than solely by declaration (with interest on overdue amounts of interest, to the extent permitted by law, and on such principal (or Amortised Face Amount) of each Note at the rate of interest (or Amortisation Yield as calculated under Condition 6(c), 6(g) or 6(h), as appropriate) specified herein, to the date of such payment or deposit) and the expenses of the Trustee, and reasonable compensation to the Trustee, its agents, legal advisers, and any and all defaults under the Notes of such Series, other than the non-payment of principal (or Amortised Face Amount) or, in the case of Interest Only Notes, interest on the Notes which shall have become due solely by declaration, shall have been remedied, then, and in every such case, Noteholders (including Principal Couponholders as aforesaid) holding 75 per cent. in aggregate principal amount of the Notes of such Series then outstanding, after a meeting of Noteholders held in accordance with the procedures described in Condition 11, by written notice to the Republic and to the Trustee, may on behalf of the holders of all of the Notes of such Series waive all defaults and rescind and annul such declaration and its consequences; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent default, or shall impair any right consequent thereon.

This Condition 10 shall apply to Principal Only Notes and Interest Only Notes as if references in this Condition 10 to "Notes" were references to the Principal Only Notes alone or to each Class of Interest Only Notes treated separately (and "Noteholders" shall be construed accordingly) and as if references to "principal amount" were, in the case of Interest Only Notes, references to "Face Amount".

## 11. Meeting of Noteholders, Modification and Waiver

*(a) Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders of a Series to consider any matter affecting their interests, including modification by Extraordinary Resolution of the Notes of such Series (including these Conditions insofar as the same may apply to such Notes). For the purposes of this Condition 11, the approval of any Extraordinary Resolution pursuant to Condition 4(a) or 12(a), the making of any request that the Trustee declare the Notes of such Series due and payable pursuant to Condition 10 or that the Trustee institute proceedings against the Republic pursuant to Condition 12, and

calling, attendance or participation at any meeting of Noteholders generally, if the Amortisation Provisions are specified on the face of the Notes of any Series as applying to such Notes, the Principal Couponholders shall be deemed to be Noteholders holding Bearer Notes of the principal amount represented by the Principal Coupons they hold and each Noteholder shall for such purposes be deemed to hold only the principal amount of Bearer Notes in respect of which it retains the Principal Coupons. Such a meeting may be convened by the Republic or the Trustee, and shall be convened by the Trustee (subject to being indemnified to its satisfaction against all costs and expenses thereby occasioned) upon written request of Noteholders holding not less than 10 per cent. in principal amount of the Notes of the relevant Series for the time being outstanding. The quorum for any meeting to consider an Extraordinary Resolution will be two or more persons holding or representing a clear majority in principal amount of the Notes or Principal Coupons (if any) of the relevant Series for the time being outstanding, or at any adjourned meeting two or more persons holding or representing holders of Notes or Principal Coupons (if any) of the relevant Series whatever the principal amount of the Notes or Principal Coupons (if any) of the relevant Series held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to amend the dates of maturity or redemption or other payment of principal (in whole or part) of the Notes of any Series or any date for payment of interest thereon, (ii) to reduce or cancel the Principal Amount of the Notes of any Series, (iii) to reduce the rate or rates of interest in respect of the Notes of any Series or to vary the method or basis of calculating the rate or rates or amount of interest, (iv) if there is shown on the face of the Notes of any Series a Minimum Interest Rate and/or a Maximum Interest Rate, to reduce such Minimum Interest Rate and/or such Maximum Interest Rate, (v) to change the method of calculating the Amortised Face Amount in respect of Zero Coupon Notes, Principal Only Notes or Interest Only Notes of any Series, (vi) to change the currency or currencies of payment of the Notes of any Series or (vii) to modify the provisions concerning the quorum required at any meeting of Noteholders of any Series or the majority required to pass the Extraordinary Resolution, in which case the necessary quorum will be two or more persons holding or representing, save as provided below, not less than 75 per cent, or at any adjourned meeting, save as provided below, not less than 25 per cent. in principal amount of the Notes of the relevant Series for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on all holders of Notes of the relevant Series (whether or not they were present or represented at the meeting at which such resolution was passed) and on all Principal Couponholders (if any) and all Couponholders (if any). In the Trust Deed, "Extraordinary Resolution" is defined to mean a resolution passed at a meeting of holders of Notes or Principal Coupons (if any) of a Series, which meeting was duly convened and held in accordance with the provisions of the Trust Deed, by a majority consisting of not less than 50 per cent. of the votes cast.

*(b)  Modification and Waiver*

The Trustee and the Republic may agree, without the consent of the Noteholders, Principal Couponholders (if any) or Couponholders, to (i) any modification of any of the provisions of the Trust Deed which is a formal, minor or technical nature or is made to correct a manifest error, and (ii) any other modification (except as mentioned in the Trust Deed), and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed which is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders. Any such modification, authorisation or waiver shall be binding on the Noteholders, the Principal Couponholders (if any) and the Couponholders and, if the Trustee so requires, such modification shall be notified to the Noteholders as soon as practicable.

*(c)  Entitlement of the Trustee*

In connection with the exercise of its functions (including but not limited to those referred to in this Condition 11) the Trustee shall have regard to the interests of the Noteholders as a class and shall not have regard to the consequences of such exercise for individual Noteholders, Principal Couponholders (if any) or Couponholders and the Trustee shall not be entitled to require, nor shall any Noteholder, Principal Couponholder or Couponholder be entitled to claim, from the Republic any indemnification or payment in respect of any tax consequences of any such exercise upon individual Noteholders, Principal Couponholders (if any) or Couponholders.

*(d) Principal Only Notes and Interest Only Notes*

This Condition 11 shall apply to Principal Only Notes and Interest Only Notes as if references in this Condition 11 to "Notes" were references to the Principal Only Notes alone or to each Class of Interest Only Notes treated separately (and "Noteholder" shall be construed accordingly) and as if references to "principal amount" were, in the case of Interest Only Notes, references to "Face Amount".

### 12. Enforcement

At any time after the Notes become due and payable, the Trustee may, at its discretion and without further notice, institute such proceedings against the Republic as it may think fit to enforce the terms of the Trust Deed, the Notes, the Principal Coupons (if any) and the Coupons, but it need not take any such proceedings unless (a) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders (including, if the Amortisation Provisions are specified on the face of Bearer Notes as applying to such Notes, the Principal Couponholders) holding at least 25 per cent. in principal amount of the Notes of the relevant Series outstanding, and (b) it shall have been indemnified to its satisfaction. No Noteholder, Principal Couponholder (if any) or Couponholder may proceed directly against the Republic unless the Trustee, having become bound so to proceed, fails to do so within the reasonable time and such failure is continuing.

This Condition 12 shall apply to Principal Only Notes and Interest Only Notes as if references in this Condition 12 to "Notes" were references to the Principal Only Notes alone or to each Class of Interest Only Notes treated separately (and "Noteholders" shall be construed accordingly) and as if references to "principal amount" were, in the case of Interest Only Notes, references to "Face Amount".

### 13. Indemnification of the Trustee

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility. The Trustee is entitled to enter into business transactions with the Republic and any entity related to the Republic without accounting for any profit.

### 14. Replacement of Bearer Notes, Principal Coupons, Coupons, Talons and Definitive Registered Notes

If any Bearer Note, Principal Coupon, Coupon, Talon or Definitive Registered Note is lost, stolen, mutilated, defaced or destroyed it may be replaced at the specified office of the Paying Agent in London (in the case of Bearer Notes, Principal Coupons (if any), Coupons and Talons) and the Transfer Agent in New York City (in the case of Definitive Registered Notes) subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the taxes and expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Republic may require (provided that the requirement is reasonable in the light of prevailing market practice). Mutilated or defaced Notes, Principal Coupons (if any), Coupons, Talons or Definitive Registered Notes must be surrendered before replacements will be issued.

### 15. Further Issues

The Republic may from time to time without the consent of the Noteholders, Principal Couponholders (if any) or Couponholders create and issue further securities having the same terms and conditions as the Notes of any Series in all respects (or in all respects except for the first payment of interest on them) so that such further issue shall be consolidated and form a single series with the outstanding securities of any series (including the Notes of any Series). References in these Conditions to the Notes of any Series include (unless the context requires otherwise) any other securities issued pursuant to this Condition 15 and forming a single series with the Notes of such Series. Any further securities forming a single series with the outstanding securities of any series (including the Notes of any Series) constituted under the Trust Deed or any deed supplemental to it shall be constituted under the Trust Deed. The Trust Deed contains provisions for convening a single meeting of the Noteholders of a Series and the holders of securities of other series (including the Notes of any other Series) where the Trustee so decides.

Draft 14f254S/0.5/18 May 1996

## 16. Agents

In acting under the Agency Agreement, the Agents act solely as agents of the Republic and do not assume any obligation or relationship of agency or trust for or with any holder.

## 17. Notices

Notices to holders of Registered Notes will be mailed to them at their respective addresses in the Register, the Principal Register or the Interest Register, as the case may be, and shall be published (so long as the Notes of the relevant Series are listed on the Luxembourg Stock Exchange and/or the Paris Stock Exchange and the relevant Exchange so requires, and the rules of the Luxembourg Stock Exchange so require) in a leading newspaper having general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) and/or, as the case may be, Paris (which is expected to be *L'Agence Economique et Financière*). Any such notice shall be deemed to have been given on the later of the date of such publication and fourth weekday (being a day other than a Saturday or a Sunday) after the date of mailing. Notices to the holders of Bearer Notes will be valid if published in a daily newspaper of general circulation in London and (so long as the Notes of the relevant Series are listed on the Luxembourg Stock Exchange and/or the Paris Stock Exchange and the relevant Exchange so requires, and the rules of the Luxembourg Stock Exchange so require) in a leading newspaper having general circulation in Luxembourg and/or Paris, as the case may be, or, if in the opinion of the Trustee any such publication is not practicable, in another leading daily English language newspaper of general circulation in Europe approved by the Trustee and, so long as the Notes are listed on the Paris Stock Exchange and that Exchange so requires, in a French language newspaper with general circulation in Europe. It is expected that such publications will be made in the *Financial Times* in London, the *Luxemburger Wort* in Luxembourg and *L'Agence Economique et Financière* in Paris. Notices will, if published more than once or on different dates, be deemed to have been given on the date of the first publication in both such newspapers as provided above.

Principal Couponholders (if any) and Couponholders shall be deemed for all purposes to have notice of the contents of any notice to the holders of Bearer Notes in accordance with this Condition 17.

## 18. Governing Law, Jurisdiction and Waiver of Immunity

### (a) Governing Law

The Trust Deed, the Notes, the Principal Coupons (if any), the Coupons and the Talons are governed by, and shall be construed in accordance with, English law.

### (b) Jurisdiction

The Republic has in the Trust Deed irrevocably submitted to the jurisdiction of the courts of England; any New York State or federal court sitting in the Borough of Manhattan, New York City; and the courts of the Republic of Argentina (the "Specified Courts") over any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Notes, the Principal Coupons (if any), the Coupons or the Trust Deed (a "Related Proceeding"). The Republic has in the Trust Deed waived any objection to Related Proceedings in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have been brought in an inconvenient forum. The Republic agrees that a final non-appealable judgment in any such Related Proceeding (the "Related Judgment") shall be conclusive and binding upon it and may be enforced in any Specified Court or in any other courts to the jurisdiction of which the Republic is or may be subject (the "Other Courts"), by a suit upon such judgment.

### (c) Agent for Service of Process

The Republic has in the Trust Deed agreed that (i) service of all writs, process and summonses in any Related Proceeding or any action or proceeding to enforce or execute any Related Judgment brought against it in the State of New York may be made upon Banco de la Nación Argentina, presently located at 299 Park Avenue, New York, New York 10171, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint CT Corporation System to act as its agent for such purpose, and (ii) service of all writs, process and summonses in any Related Proceeding or any action or proceeding to enforce or execute any Related Judgment brought against it in England may be made upon

Banco de la Nación Argentina, presently located at Longbow House, 14/20 Chiswell Street, London EC1Y 4TD, England, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint a successor agent to act as its agent for such purpose.

### (d)  Waiver of Immunity

To the extent that the Republic or any of its revenues, assets or properties shall be entitled, in any jurisdiction in which any Specified Court is located, in which any Related Proceeding may at any time be brought against it or any of its revenues, assets or properties, or in any jurisdiction in which any Specified Court or Other Court is located in which any suit, action or proceeding may at any time be brought solely for the purpose of enforcing or executing any Related Judgment, to any immunity from suit, from the jurisdiction of any such court, from set-off, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (and consents generally for the purposes of the State Immunity Act 1978 to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment), *provided, however* that attachment prior to judgment or attachment in aid of execution will not be ordered by any courts of the Republic of Argentina in respect of (i) property of the public domain located in the territory of the Republic included within the provisions of Articles 2337 and 2340 of the Civil Code of Argentina, (ii) property located in the territory of the Republic which is dedicated to the purpose of providing an essential public service, (iii) property which constitutes freely available reserves, pursuant to Article 6 of Law No. 23,928 enacted by the Argentine Congress on March 27, 1991 ("Convertibility Law"), the amount, composition and investment of which will be reflected on the balance sheet and accounting statement of Banco Central de la Republica Argentina consistently prepared in accordance with Article 5 of the Convertibility Law, and (iv) property covered by Article 19 of the 1996 Budget Law No. 24,624 (the "1996 Budget Law"); the provisions of which have been included in the Permanent Supplementary Budget Law, which provides that any funds, assets and other financial resources (whether in the form of cash, bank deposits, securities, third party obligations or any other method of payment), including the proceeds of any financing, of the Argentine Government and any of its governmental agencies and entities relating to the performance of the 1996 budget and any future budgets will be immune from attachment and may not be subject to any judicial action that may affect in any way their transferability, and which further provides that amounts due pursuant to any judicial action must be paid out of appropriations in the national budget. The courts of the Republic, in general, can only render judgments against the Republic that can be enforced against the Republic to the extent permitted by (i) the Law of Consolidation of Public Debt No. 23,982, particularly Article 22, (ii) Law No. 3,952 and (iii) the 1996 Budget Law, particularly Article 20, which has also been included in the Permanent Supplementary Budget Law. Any judgment against the Republic of a court in England or New York which satisfies the requirements of Articles 517 through 519 of Law No. 17,454, as amended by Law No. 22,434 (National Code of Civil and Commercial Procedures) is capable of being enforced in the courts of the Republic in accordance with the laws of the Republic taking into account (i) the Law of Consolidation of Public Debt No. 23,982, particularly Article 22, (ii) Law No. 3,952 and (iii) the 1996 Budget Law, particularly Article 20. The agreement and waiver provided herein, insofar as it relates to any jurisdiction other than a jurisdiction in which a Specified Court is located, is given solely for the purpose of enabling the Trustee, a Noteholder, a Principal Couponholder or a Couponholder to enforce or execute a Related Judgment. The waiver of immunities referred to herein constitutes only a limited and specific waiver for the purpose of the Notes, the Principal Coupons, the Coupons and the Trust Deed and under no circumstances shall it be interpreted as a general waiver of the Republic or a waiver with respect to proceedings unrelated to the Notes, the Principal Coupons, the Coupons or the Trust Deed.

# UNITED STATES TAXATION

## United States Federal Income Taxation

The following is a summary of certain United States federal income tax considerations that may be relevant to a holder of a Note that is a citizen or resident of the United States, that is a U.S. domestic corporation or that otherwise is subject to United States federal income taxation on a net income basis in respect of the Note (a "U.S. Holder"). This summary is based on the tax laws of the United States, including the Internal Revenue Code of 1986, as amended, Treasury regulations issued thereunder, published rulings and court decisions, all of which are subject to change, possibly with retroactive effect. This summary deals only with U.S. Holders that will hold Notes as capital assets, and does not address tax considerations applicable to investors that may be subject to special tax rules, such as banks, tax-exempt entities, insurance companies, dealers in securities or currencies, traders in securities electing to mark to market, persons that will hold Notes as a position in a "straddle" or conversion transaction, or as part of a "synthetic security" or other integrated financial transaction or persons that have a "functional currency" other than the U.S. dollar.

THIS SUMMARY OF FEDERAL INCOME TAX CONSIDERATIONS IS PROVIDED FOR GENERAL INFORMATION ONLY. INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE TAX CONSEQUENCES TO THEM OF HOLDING NOTES, INCLUDING THE APPLICATION TO THEIR PARTICULAR SITUATION OF THE UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS DISCUSSED BELOW, AS WELL AS THE APPLICATION OF STATE, LOCAL, FOREIGN OR OTHER TAX LAWS.

## Original Issue Discount

Each Principal Only Note and Interest Only Note will be treated as a separate zero coupon debt instrument that is subject to the special rules for obligations having original issue discount ("OID"). U.S. Holders of such Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for United States federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of a Note, whether such Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Note for all days during the taxable year that the U.S. Holder owns the Note. The daily portions of OID are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of the Note, provided that no accrual period is longer than one year. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of such Note (appropriately adjusted to reflect the length of the accrual period). The yield to maturity of a Note is the discount rate that causes the present value of the scheduled payment on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period will generally be the sum of its issue price and the amount of OID allocable to all prior accrual periods. As a result of this "constant yield" method of including OID in income, the amounts includible in income by a U.S. Holder in respect of a Note denominated in U.S. dollars generally are lesser in the early years and greater in the later years than the amounts that would be includible on a straight-line basis. As described below, however, OID accruals on the Notes will be calculated in Euros. Accordingly, a U.S. Holder of a Note may recognise a different amount of OID income in each accrual period than would the holder of an otherwise similar Note denominated in U.S. dollars.

A U.S. Holder should determine the U.S. dollar amount includible in income as OID for each accrual period by (a) calculating the amount of OID allocable to each accrual period in Euros using the constant-yield method described above, and (b) translating the amount of Euros so derived at the average exchange rate in effect during that accrual period (or portion thereof within a U.S. Holder's taxable year) or, at the U.S. Holder's election, at the spot rate of exchange on the last day of the accrual period (or the last day of

the taxable year within such accrual period if the accrual period spans more than one taxable year), or at the spot rate of exchange on the date of receipt, if such date is within five business days of the last day of the accrual period. Upon the receipt of an amount attributable to OID on the sale or retirement of a Note, a U.S. Holder will recognise ordinary income or loss measured by the difference between the amount received (translated into U.S. dollars at the exchange rate in effect on the date of receipt or on the date of disposition of the Note, as the case may be) and the amount accrued (using the exchange rate applicable to such previous accrual).

A subsequent U.S. Holder of a Note also generally will be required to include in gross income the daily portions of OID, calculated as described above. However, if the U.S. Holder acquires the Note at a price greater than its adjusted issue price, such Holder may reduce its periodic inclusions of OID income to reflect the premium paid over the adjusted issue price. Under this rule, the OID inclusions are reduced by a fraction, the numerator of which is the excess of the U.S. Holder's adjusted basis in the Note immediately after purchase over the Note's adjusted issue price, and the denominator of which is the excess of the Note's redemption price over its adjusted issue price at the time of purchase.

*Market Discount.*

If a U.S. Holder of a Note purchases the Note at a price that is lower than its adjusted issue price by at least 0.25% of its adjusted issue price multiplied by the number of remaining whole years to maturity, the Note will be considered to have "market discount" in the hands of such U.S. Holder. In such case, gain realised by the U.S. Holder on the disposition of the Note generally will be treated as ordinary income to the extent of the market discount that accrued on the Note while held by such U.S. Holder. In addition, the U.S. Holder could be required to defer the deduction of a portion of the interest paid on any indebtedness incurred or maintained to purchase or carry the Note. In general terms, market discount on a Note will be treated as accruing rateably over the term of such Note, or, at the election of the Holder, under a constant yield method. Market discount on the Note will be accrued by a U.S. Holder in Euros. The amount includible in income by a U.S. Holder in respect of such accrued market discount will be the U.S. dollar value of the amount accrued, generally calculated at the exchange rate in effect on the date that the Note is disposed of by the U.S. Holder.

A U.S. Holder may elect to include market discount in income on a current basis as it accrues (on either a rateable or constant-yield basis), in lieu of treating a portion of any gain realised on a sale of a Note as ordinary income. If a U.S. Holder elects to include market discount on a current basis, the interest deduction deferral rule described above will not apply. Any accrued market discount on a Note that is currently includible in income will be translated into U.S. dollars at the average exchange rate for the accrual period (or portion thereof within the U.S. Holder's taxable year). Any such election, if made, applies to all market discount bonds acquired by the taxpayer on or after the first day of the first taxable year to which such election applies and is revocable only with the consent of the Internal Revenue Service (the "IRS").

*Purchase, Sale and Retirement of Notes*

A U.S. Holder's tax basis in a Note generally will equal the cost of such Note to such holder, increased by any amounts includible in income by the holder as OID and market discount. The cost of such Note to a U.S. Holder will be the U.S. dollar value of the Euro or ECU purchase price on the date of purchase. In the case of a Note that is traded on an established securities market, a cash basis U.S. Holder (and, if it so elects, an accrual basis U.S. Holder) will determine the U.S. dollar value of the cost of such Note by translating the amount paid at the spot rate of exchange on the settlement date of the purchase. The conversion of U.S. dollars to Euros or ECUs and the immediate use of such currency to purchase a Note generally will not result in taxable gain or loss for a U.S. Holder.

Upon the sale, exchange or retirement of a Note, a U.S. Holder generally will recognise gain or loss equal to the difference between the amount realised on the sale, exchange or retirement and the U.S. Holder's tax basis in such Note. If a U.S. Holder receives a currency other than the U.S. dollar in respect of the sale, exchange or retirement of a Note, the amount realised will be the U.S. dollar value of the currency received calculated at the exchange rate in effect on the date the instrument is disposed of or retired. In the

case of a Note that is traded on an established securities market, a cash basis U.S. Holder and, if it so elects, an accrual basis U.S. Holder will determine the U.S. dollar value of the amount realised by translating such amount at the spot rate on the settlement date of the sale. The election available to accrual basis U.S. Holders in respect of the purchase and sale of Notes traded on an established securities market must be applied consistently to all debt instruments from year to year and cannot be changed without the consent of the IRS.

Except as discussed above with respect to market discount and below with respect to foreign currency gain or loss, gain or loss recognised by a U.S. Holder generally will be long-term capital gain or loss if the U.S. Holder has held the Note for more than one year at the time of disposition. Long-term capital gain recognised by an individual U.S. Holder generally will be subject to a maximum tax rate of 28 per cent. in respect of Notes held for more than one year and to a maximum rate of 20 per cent. in respect of Notes held for more than one year and to a maximum rate of 20 per cent. in respect of Notes held for more than 18 months. Any such gain or loss will, however, be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which the holder held such Note.

*Information Reporting and Backup Withholding*

U.S. paying agents are required to file information returns with the IRS with respect to payments made to certain U.S. Holders of Notes. In addition, certain U.S. Holders may be subject to a 31 per cent. backup withholding tax in respect of such payments if they do not provide their taxpayer identification numbers to the paying agent. Persons holding Notes who are not U.S. Holders may be required to comply with applicable certification procedures to establish that they are not U.S. Holders in order to avoid the application of such information reporting requirements and backup withholding tax.

## SUPPLEMENTAL INFORMATION MEMORANDUM ADDENDUM

This Supplemental Information Memorandum Addendum, which replaces and supersedes the Supplemental Information Memorandum Addendum dated March 9, 1998, is supplemental to and should be read in conjunction with an Information Memorandum Addendum dated October 17, 1997 (together, the "Information Memorandum Addendum") relating to the Euro Medium-Term Note Programme (the "Programme") for the issue of Notes of The Republic of Argentina (the "Republic") having maturities from 30 days to 30 years from the date of issue. This Supplemental Information Memorandum Addendum is deemed to be incorporated into the Information Memorandum Addendum. Terms defined or otherwise attributed meanings in the Information Memorandum Addendum have the same meaning in this Supplemental Information Memorandum Addendum. The Republic has warranted to the Dealers that, inter alia, this Supplemental Information Memorandum Addendum is true and accurate in all material respects, does not contain any untrue statement of material fact nor omits to state any material fact known to the Republic necessary to make statements herein not misleading and all reasonable enquiries have been made to ascertain such facts and to verify the accuracy of all such statements. The Republic accepts responsibility accordingly.


## RECENT DEVELOPMENTS

*The information included herein supplements, and to the extent inconsistent therewith replaces, the information about Argentina that is incorporated by reference in the Information Memorandum Addendum.*

### Government and Politics

On October 26, 1997, Argentina held nationwide elections for 127 of the 257 seats that comprise the Chamber of Deputies, the lower house of Congress. The Partido Justicialista or Peronist Party ("PJ"), of which President Menem is the leader, garnered 51 seats and the Alliance or Alianza, a coalition of the opposition parties Unión Cívica Radical or Radical Civic Union ("UCR") and Frente del País Solidario or Front for a Country in Solidarity ("Frepaso"), won 42 seats. In addition, in those provinces in which the UCR and Frepaso did not act in coalition, the UCR won 17 seats and Frepaso 4 seats. The PJ now holds a total of 120 seats, less than the number required for an absolute majority in the Chamber of Deputies.

### Gross Domestic Product

During 1997, Gross Domestic Product grew an estimated 8.4 per cent. In March 1998, industrial production increased approximately 9.7 per cent. over the level recorded in March 1997.

### Inflation

During the year 1997, inflation, as measured by the Consumer Price Index, increased by 0.3 per cent. and, as measured by the Wholesale Price Index, decreased by 0.9 per cent. As of April 30, 1998 the CPI increased by 1.2% and the WPI decreased by 1.5% from levels recorded on April 30, 1997.

### Employment and Labour

The national unemployment rate fell from 16.1 per cent. in May 1997 to 13.7 per cent. in October 1997. As a result of structural reforms to the Argentine economy stemming from the Convertibility Plan and, more recently, legislative measures taken by the Government to provide greater labour flexibility in wage bargaining, real wages fell 7.6 per cent. between 1991 and 1996. This trend continued in 1997, with real wages declining approximately 0.3 per cent. between December 31, 1996 and December 31, 1997.

### Deregulation of the Economy and Privatisations

On January 23, 1998 the Government selected the winning bidder who offered to pay the Government U.S.$171 million in annual royalties for the concession. The Government entered into the concession

xan 1442549/0.5/19 May 1998

contract with the winning bidder on February 9, 1998, and the decree approving the contract was issued on February 13, 1998. On February 27, 1998 the Government raised U.S.$82.7 million from the sale of its remaining 20 per cent. stake in gas distributor Gas Natural BAN S.A.

## Balance of Payments - Trade Balance

During the first three months of 1998, Argentina recorded a trade deficit of U.S.$21 billion. During 1997, Argentina recorded a trade deficit of U.S.$4.9 billion, during which year exports (measured on a FOB basis) totalled U.S.$25.5 billion and imports (measured on a CIF basis) totalled U.S.$30.3 billion. During the same period in 1996, Argentina recorded a trade surplus of U.S.$49 million, during which exports and imports totalled approximately U.S.$23.8 billion.

In October 1997, Argentina and Canada dropped their respective trade barriers with respect to pork and beef products. On April 1, 1997, Brazil, Argentina's principal trading partner, implemented restrictions requiring importers to pay cash for all imports, except for limited classes of imports and imports with financing terms greater than 360 days. On April 3, 1997 Brazil granted Argentina and certain other countries in the region a partial exemption from these restrictions, permitting imports from these countries valued at no more than U.S.$40,000 and having financing terms of less than 90 days. On January 26, 1998, Brazil announced that these exemptions would be extended for an indefinite period of time.

In 1997, Argentina recorded a current account deficit of U.S.$10.1 billion and a capital account surplus of U.S.$13.2 billion, representing a 167.2 per cent. increase in the current account deficit and a 74.1 per cent. increase in the capital account surplus from levels recorded during 1996. In 1997, total foreign direct investment was approximately U.S.$6.3 billion, representing a 24.3 per cent. increase over the level recorded during 1996.

## Financial Sector

As of March 31, 1998, total deposits (46.6 per cent. of which were in pesos and 53.4 per cent. of which were in U.S. dollars) in the banking system were U.S.$72.5 billion, representing an increase of 26.3 per cent. over the level recorded on March 31, 1997.

The recent instability in global capital markets which began in October 1997 as a result of the currency devaluations and other economic problems in several Asian countries, affected the share prices of Argentine companies listed on the Buenos Aires Stock Exchange (the "Bolsa") and caused a widening in the spreads of Argentine Government bonds traded in the secondary market. Between October 22, 1997 and December 31, 1997, the average price of the shares listed on the Bolsa declined 20.3 per cent. and the spread on Argentina's Brady par bonds increased by 188 basis points. Between January 2, 1998 and April 30, 1998, the average price of the shares listed on the Bolsa increased 0.7 per cent. and the spread on Argentina's Brady par bonds decreased by 83 basis points.

## Monetary Base and Reserves

As of April 30, 1998, the monetary base (consisting of currency in circulation, reserves required in U.S. dollars for peso deposits, Bank Liquidity Notes and repurchase agreements between Banco Central and commercial banks) was U.S.$21.3 billion, representing a 12.4 per cent. increase from the level recorded on April 30, 1997. In addition, as of such date, gross international reserves (including gold deposits and approximately U.S.$1.8 billion of public bonds) stood at U.S.$23.3 billion, representing a 15.2 per cent. increase over the level recorded on April 30, 1997.

## Public Sector Accounts

The Government recorded a U.S.$4.3 billion deficit (excluding revenues from privatisations and sales of tax receivables and including expenses related to some provincial social security systems) in its public accounts in 1997, approximately U.S.$239 million below the fiscal deficit target set by the International Monetary Fund (the "IMF") for 1997. The Government expects to record a deficit in 1998, on the same basis, of U.S.$3.5 billion. During the first three months of 1998, the Government recorded a deficit of

U.S.$1.3 billion, approximately U.S.$100 million below the IMF fiscal deficit target for the first quarter of 1998.

On February 4, 1998, the IMF approved a three-year standby facility for Argentina in the amount of U.S.$2.8 billion. Among other targets, the agreement between the IMF and Argentina requires that Argentina does not exceed a public fiscal deficit (the overall balance excluding revenues from privatizations) of U.S.$3.5 billion for 1998. In addition, the Argentine Government has committed itself to limit the trade deficit of Argentina to no more than U.S.$5.0 billion in 1998. If in any month in 1998 the cumulative 12-month merchandise trade deficit (with imports on a CIF basis) exceeds U.S.$5.0 billion, the Government, in consultation with the IMF, will take appropriate corrective fiscal and/or credit policy measures. During January, 1998, Argentina recorded a trade deficit of U.S.$0.9 billion, taking the cumulative 12-month merchandise trade deficit to approximately U.S.$5.4 billion. As a result, representatives of the IMF met with the Government in late March and early April 1998. Although it was decided that no specific corrective measures needed to be taken at that time, the IMF and the Government agreed to meet in July 1998 to revisit trade deficit issues.

Argentina has reserved the standby facility for use in special or urgent circumstances and does not otherwise intend to draw down on the standby facility in the normal course of operations.

### Public Sector Debt

As of December 31, 1997, total net public debt (including debt of the Government and public entities but excluding debt of the provinces and state-owned banks) was U.S.$98.1 billion and total gross public debt was U.S.$101.1 billion. Approximately U.S.$91.6 billion of total gross public debt is denominated in currencies other than the peso, principally in U.S. dollars.

Between September 1, 1997 and the date hereof, Argentina issued the following debt instruments:

| Issue | Principal Amount |
| --- | --- |
| | *(in millions)* |
| 9.75 per cent. Bonds due 2027 | U.S.$2,250 |
| Step-Down Notes due 2004[1] | ITL750,000 |
| Step-Down Notes due 2004[1] | ITL375,000 |
| 8.0 per cent. Bonds due 2009 | DM1,000 |
| Spread - Adjusted Notes due 2002 | U.S.$500 |
| 8.0 per cent. Notes due 2000[1] | ITL300,000 |
| 8.75 per cent. Notes due 2003[1] | Euro400 |
| 9.75 per cent. Bonds due 2027 | U.S.$500 |
| Step-Down Notes due 2008 | DM1,500 |
| Step-Down Notes due 2009[1] | ITL750,000 |
| Step-Down Bonds due 2008 | FRF1,500 |
| Step-Down Bonds due 2008 | DFL500 |
| 11.375% Bonds due 2017 | U.S.$750 |
| Floating Rate Accrual Notes due 2005 | U.S.$1,000 |
| 8.125% Bonds due 2008 | Euro750 |
| 9.25% Bonds due 2001 | U.S.$200 |
| Interest Strip Notes due 2028[1][2] | Euro750 |

*Notes:*

(1)  Issues made under the Republic's U.S.$11.0 billion Medium-Term Note Programme.

(2)  Expected to be issued on May 28, 1998.

In addition, on January 12, 1998, Argentina entered into a three-year loan agreement with a syndicate of eleven banks for an amount of U.S.$2.0 billion, which amount was fully disbursed on January 14, 1998.

## GENERAL INFORMATION

1.  The Republic is not involved in any litigation or arbitration proceedings relating to claims or amounts which are material in the context of the issue of the Notes nor so far as the Republic is aware is any litigation or arbitration pending or threatened.

2.  Save as disclosed herein, there has been no adverse change since October 17, 1997 in the financial position or prospects of the Republic which is material in the context of the issue of the Notes.

Draft 1442543/0.5/19 May 1998

44

# Exhibit E

**BNP PARIBAS**

Creation date : 08/13/2007  4:59:21PM

## Last positions

| ISIN | Security description | AC Acct | Position | Depositary | Restriction Coll. | Quantity | Maturity |
|---|---|---|---|---|---|---|---|
| **Securities account : PARBIT - 41329975741011771601 L - BNL CONTO PROPRIETA** | | | | | | | |
| US0401INAL29 | ARGENTINA 0%.08-070598 IPMT | 01  11X00 | 08/10/2007 | CLML/UBNL/OMNIBUS | 0.0 0.0  No | 7,880,000.000000 FAMT | |
| US0401INAM02 | ARGENTINA 0%.280511 IPMT | 01  11X00 | 08/10/2007 | CLML/UBNL/OMNIBUS | 0.0 0.0  No | 9,000,000.000000 FAMT | |
| **Securities account PARBIT - 41329975741011771601 L - BNL CONTO PROPRIETA** | | | | | | | |

REDACTED

# Exhibit F

# NOTICE TO HOLDERS OF
# THE FOLLOWING NOTES ISSUED BY
# THE REPUBLIC OF ARGENTINA (THE "ISSUER")
## UNDER ITS USD20,000,000,000 MEDIUM TERM NOTE PROGRAMME

| | |
|---|---|
| XS0064910812 | US040114MAN02 |
| XS0065490988 | US040114NAN84 |
| XS0066125559 | US040114MAP59 |
| XS0070531420 | US040114NAP33 |
| XS0070808166 | US040114MAQ33 |
| XS0071898349 | US040114NAQ16 |
| USP0450KAB90 | US04011MAR16 |
| AT0001912331 | US04011NAR98 |
| XS0076249308 | XS0088590863 |
| XS0076397248 | XS0089277825 |
| XS0077243730 | US04011NAS71 |
| USP8055KAP05 | XS0096960751 |
| XS0078502399 | XS0098314874 |
| XS0080809253 | XS0100354066 |
| XS0081057589 | XS0105224470 |
| XS0084071421 | XS0105694789 |
| XS0084832483 | XS0109203298 |
| US04011MAL46 | USP8055KFQ33 |
| US04011NAL29 | XS0113833510 |
| US04011MAM29 | XS0124528703 |
| US04011NAM02 | |

(together the **"Notes"**)

**THIS NOTICE CONTAINS IMPORTANT INFORMATION THAT IS OF INTEREST TO THE BENEFICIAL OWNERS OF THE SUBJECT SECURITIES. IF APPLICABLE, ALL DEPOSITORIES, CUSTODIANS, AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE ARE REQUESTED TO EFFECT RETRANSMITTAL OF THIS NOTICE TO SUCH BENEFICIAL OWNERS ON AN EXPEDITED BASIS.**

Reference is made to a notice from J.P. Morgan Trustee and Depositary Company Limited (**"JPMTDL"**) dated 7 August 2006 advising the holders of the Notes (the **"Noteholders"**) that JPMTDL reassumed the trusteeship for the Notes from Wells Fargo Bank, N.A. (**Wells Fargo**) with effect from 4 August 2006. Noteholders are hereby advised further that pursuant to an order of the High Court of England and Wales dated 3 April 2007 and effective as of 19 May 2007, The Bank of New York (the **"Trustee"**) has succeeded to all rights and obligations of JPMTDL as Trustee under the Trust Deed dated 27 July, 1993 (as amended and supplemented) between the Republic and JPMTDL constituting the Notes (the **"Trust Deed"**). All capitalised terms not otherwise defined herein shall have the meanings given to them in or pursuant to the Trust Deed.

The Trustee hereby confirms that as of the date of this notice each Series of the Notes outstanding under the Programme has been declared immediately due and payable by the Trustee or its predecessors. The Trustee or its predecessor, as the case may be, have made demand upon the Republic for immediate payment of all principal and interest due on each Series of Notes and have reserved all of rights of the Trustee and the Noteholders attaching to each Series of the Notes. The Republic has shown no intention of honouring the demands for payment made by the Trustee and its predecessors.

As was the position of its predecessors, the Trustee does not intend to take any action against the Republic to enforce the terms of the Trust Deed, the Notes and the Coupons, unless, pursuant to Condition 12 of the Notes, (a) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least 25 per cent. in nominal amount of the Notes of the relevant Series outstanding and (b) it shall have been indemnified to its satisfaction. The Trustee is advised that the clearings systems are no longer able to confirm the validity of any directions Noteholders may have provided to the Trustee's predecessors.

Noteholders who wish to direct the Trustee to bring an action against the Republic to enforce the terms of the Notes should contact the clearing system in which their Notes are held, or if applicable, their custodian, to cause the clearing system to block their holdings in the Notes from trading and send the Trustee a SWIFT message confirming the Noteholder's directions. Noteholders who hold their Notes through a DTC Participant must cause such DTC Participant to provide the Noteholder's directions to the Trustee via facsimile or post. Each direction to the Trustee must reference the relevant ISIN or CUSIP and the nominal amount of Notes to which the direction pertains and include, the account number and identity of the clearing system participant holding the Notes as well as the name and contact details of the beneficial holder of the Notes. Upon receipt of a valid direction, the Trustee shall in due course provide to the Noteholder giving such direction a copy of the Trustee's standard form deed of indemnity.

Noteholders who have questions concerning the information contained in this Notice may contact the Trustee at the following address:

> One Canada Square
> London E14 5AL
> Attn: CT-Corporate-Sovereign Unit
> Telephone: +44 (0) 20 7964 8781/8791
> Facsimile: +44 20 7964 2530

29 May 2007                         The Bank of New York, as Trustee

*No representations are made as to the correctness or accuracy of any ISIN contained herein. ISINs are included herein solely for the convenience of Holders.*

# Exhibit G

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

August 3, 2007

**VIA DHL**

Edmond F. Leedham
Vice President
The Bank of New York
Corporate Trust Services
One Canada Square
London E14 5AL
United Kingdom

        **Re:**    **Notice of Acceleration**

Dear Mr. Leedham:

        We write on behalf of our client Banca Nazionale del Lavoro ("BNL").

        BNL is beneficial owner of the following notes:

| Principal Amount | ISIN | CUSIP | Common Code |
|---|---|---|---|
| € 7,880,000.00 | US04011NAL29 | 04011NAL2 | 008730202 |
| € 9,000,000.00 | US04011NAM02 | 04011NAM0 | 008730229 |

(See account statements enclosed herewith.)  The foregoing notes were issued by the Republic of Argentina (the "Republic") pursuant to the Trust Deed dated as of July 27, 1993, as supplemented by the 10th Supplemental Trust Deed dated May 26, 1998 (among other documents), as part of the Republic's U.S.$11,000,000,000 Euro Medium-Term Note Programme.

        As you acknowledged in the enclosed Notice dated May 29, 2007, the Republic is in default on the above-referenced notes pursuant to paragraph 10 of the Terms and Conditions of the Notes dated July 27, 1993 because it has failed to pay principal on the notes identified by ISIN US04011NAL29 when due and payable and such failure has continued for a period of over 30 days, and because the Republic declared a moratorium on the payment of principal on these

notes. As set forth in paragraph 10 of the Term and Conditions of the Notes dated July 27, 1993, we hereby provide The Bank of New York, successor to the Trustee, with notice that BNL declares the principal of the foregoing notes to be immediately due and payable, and any applicable interest to be payable immediately as well. We also hereby demand that you institute proceedings against the Republic.

Best regards,

Russell W. Jacobs

Russell W. Jacobs

Enclosures

clearstream | **DEUTSCHE BÖRSE GROUP**

**Confidential**

Mrs. Emmanuelle Riess
Network Manager
BP2S
66, rue de la Victoire
F - 75009 Paris

Clearstream Banking

42 Avenue JF Kennedy
I -1855 Luxembourg

Mailing address
L -2967 Luxembourg

Luxembourg, 3rd August 2007

Phone
+352-243-32 795

Fax
+352-243-63 27 95

Internet
clearstream.com

Statement of account for the purpose of civil litigation claim

Dear Madam,

We hereby certify that on 3rd August 2007, the following positions held on account 11033 in the name of BP2S MILAN/BNL/OMNIBUS ACCOUNT have been blocked:

- EUR 7,880,000 quoted under ISIN code US04011NAL29 (EUR 0.00 ARGENTINA .REP. (STP-CPN) (REGS) 280506) (Cusip 04011NAL2)
- EUR 9,000,000 quoted under ISIN code US04011NAM02 (EUR 0,00 ARGENTINA REP. (STP CPN) (REGS) 280511) (Cusip 04011NAM0)

E mail
Stephane.el.gharbi@
clearstream.com

Please note that the above holdings have been blocked in such account as from settlement date 3rd August 2007 for the purpose of filing a litigation claim. This holding can be unblocked only at your request and only provided that you are able to meet any further requirements we may have for unblocking your holdings in the circumstances under which your request is made.

Yours faithfully,

Stephane El Gharbi
Vice President
Relationship Mgt. Southern Europe

Daniel Mureddu
Vice President
Relationship Mgt. Southern Europe

Clearstream Banking
société anonyme is organised
with limited liability in the
Grand Duchy of Luxembourg
RC Luxembourg B 9248

Registered address
42 Avenue JF Kennedy
L -1855 Luxembourg



**BNP PARIBAS**
SECURITIES SERVICES

## ESTRATTO CONTO / ACCOUNT STATEMENT

Deposito Custodia N°
Safekeeping account N°
**1011771601L**

K 316
BANCA NAZIONALE DEL LAVORO SPA
DIREZIONE OPERATIONS UFFICIO
FINANZA ED ESTERO
VIA DEGLI ALDOBRANDESCHI 300
00163 ROMA
IT   ITALIE

May 02, 2007          page 71

Movimenti di / Movements of : APRIL    2007

| DATA / Date | DESCRIZIONE TITOLI / Description of Securities | DEPO / Dpry | ADDEBITI / ACCREDITI - NUMERO / NOMINALE Debit / Credit - Number / Nominal | SALDO / Balance |
|---|---|---|---|---|
| 05/04/2007 | P9402BN87  / 07015440711 | | 5000,00 | |
| 17/04/2007 | P9412CK88  / 07016008011 | | -90000,00 | |
| 17/04/2007 | P9413AB53  / 07016014211 | | 90000,00 | |
| | | | closing balance unblocked : | 0,00 |
| | | | closing balance blocked : | 0,00 |
| | | | **closing balance :** | 0,00 |
| | ISIN CODE : USP8055KFQ33   FMT ARGENTINE 9% 00/05 | EUR 010761 | **opening balance :** | 0,00 |
| | | | opening balance unblocked : | 0,00 |
| | | | opening balance blocked : | 0,00 |
| 22/03/2007 | P9321AB02  / 07014546511 | | 21000,00 | |
| 23/03/2007 | P9323AW63  / 07014422411 | | -21000,00 | |
| | | | closing balance unblocked : | 0,00 |
| | | | closing balance blocked : | 0,00 |
| | | | **closing balance :** | 0,00 |
| | ISIN CODE : US0378331005   UNT APPLE INC | USD 011058 | **opening balance :** | 0 |
| | | | opening balance unblocked : | 0 |
| | | | opening balance blocked : | 0 |
| 08/01/2007 | P9108BL39  / 07000211311 | | 40 | |
| 11/01/2007 | P9108BN71  / 07000212711 | | -40 | |
| | | | closing balance unblocked : | 0 |
| | | | closing balance blocked : | 0 |
| | | | **closing balance :** | 0 |
| | ISIN CODE : US04011NAL29   FMT ARGENTINA 0%98-070598 IPMT | EUR 010761 | **opening balance :** | 0,00 |
| | | | opening balance unblocked : | 0,00 |
| | | | opening balance blocked : | 0,00 |
| 07/03/2007 | P9305DA84  / | | 7880000,00 | |
| | | | closing balance unblocked : | 7880000,00 |
| | | | closing balance blocked : | 0,00 |
| | | | **closing balance :** | 7880000,00 |
| | ISIN CODE : US04011NAM02   FMT ARGENT.NA0%280511 I?MT | EUR 010761 | **opening balance :** | 0,00 |
| | | | opening balance unblocked : | 0,00 |
| | | | opening balance blocked : | 0,00 |
| 07/03/2007 | P9305DA85  / | | 9000000,00 | |
| | | | closing balance unblocked : | 9000000,00 |
| | | | closing balance blocked : | 0,00 |
| | | | **closing balance :** | 9000000,00 |

Vi ricordiamo che eventuali reclami devono pervenire entro il termine contrattualmente previsto. In mancanza di opposizione scritta, l'estratto conto si intende senz'altro approvato con pieno effetto riguardo tutti gli elementi che hanno concorso a formare le risultanze.

We advise that any notification of inaccuracy must be received by the bank within the contractual term. Unless such a written claim is sent, the statement shall be considered

Customer Accounts + Positions - 11033 [BP2S MILAN, BNL OMNIBUS ACCOUNT]   MILAN

| Common Cd | ISIN Cd | Curr | Int.Rt. | Security Name | Period | Dep. | Nominal Qty | Held Free Nominal (+) | Iso Cd | Last Upd Trustmp |
|-----------|---------|------|---------|---------------|--------|------|-------------|-----------------------|--------|------------------|
| 0800371023 | US040114AB02 | EUR | 10.0 | ARGENTINA REP OF(GERMANY) | -9/11 | 49 | 4000.00 | 4000.00 | EUR | 09-00-2006 01:00:39 |

Total: |

Customer Accounts + Positions - 11033 [BP2S MILAN/BNL/OMNIBUS ACCOUNT] - MILAN

| Common Cd | ISIN Cd | Curr | Int. Rt. | Security Name | Period | Dep. | Nominal Qty | Held Free Nominal (+) | Iso Cd | Last Upd Tmstmp |
|-----------|---------|------|----------|---------------|--------|------|-------------|----------------------|--------|-----------------|
| | | EUR | | ARGENTINA REPSTEP MINISERI | | | | | EUR | |

Total:



**BNP PARIBAS**
*SECURITIES SERVICES*

Milan, 03 August 2007

Please be informed as follows about the position on the BNL account 1011771601L relative to two Argentina bonds at 03/08/2007:

ISIN US04011NAL29        7880000 FMT
ISIN US04011NAM02        9000000 FMT

Yours faithfully

**BNP PARIBAS**
Securities Services
Succursale di Milano
Via Ansperto, 50 20123 MILANO

BNP Paribas Securities Services - Succursale di Milano
Via Ansperto, 6 - 20123 Milano - Tel: (+39) 02 7247 9 - Fax (+39) 02 7247 4444
Registro delle Imprese di Milano, Codice Fiscale e Partita IVA n. 13449250151 - C.C.I.A.A. di Milano n° REA 1052488 - iscritta all'Albo delle Banche al n. 5483
BNP PARIBAS Securities Services - S.A. - Sede legale 3 Rue d'Antin, 75002 Paris - Capitale sociale 185 279 835 euro - www.bnpparibas.com

Received on 03/08/2007 18.42.38

## NOTICE TO HOLDERS OF
## THE FOLLOWING NOTES ISSUED BY
## THE REPUBLIC OF ARGENTINA (THE "ISSUER")
## UNDER ITS USD20,000,000,000 MEDIUM TERM NOTE PROGRAMME

| | |
|---|---|
| XS0064910812 | US040114MAN02 |
| XS0065490988 | US040114NAN84 |
| XS0066125559 | US040114MAP59 |
| XS0070531420 | US040114NAP33 |
| XS0070808166 | US040114MAQ33 |
| XS0071898349 | US040114NAQ16 |
| USP0450KAB90 | US04011MAR16 |
| AT0001912331 | US04011NAR98 |
| XS0076249308 | XS0088590863 |
| XS0076397248 | XS0089277825 |
| XS0077243730 | US04011NAS71 |
| USP8055KAP05 | XS0096960751 |
| XS0078502399 | XS0098314874 |
| XS0080809253 | XS0100354066 |
| XS0081057589 | XS0105224470 |
| XS0084071421 | XS0105694789 |
| XS0084832483 | XS0109203298 |
| US04011MAL46 | USP8055KFQ33 |
| US04011NAL29 | XS0113833510 |
| US04011MAM29 | XS0124528703 |
| US04011NAM02 | |

(together the **"Notes"**)

**THIS NOTICE CONTAINS IMPORTANT INFORMATION THAT IS OF INTEREST TO THE BENEFICIAL OWNERS OF THE SUBJECT SECURITIES. IF APPLICABLE, ALL DEPOSITORIES, CUSTODIANS, AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE ARE REQUESTED TO EFFECT RETRANSMITTAL OF THIS NOTICE TO SUCH BENEFICIAL OWNERS ON AN EXPEDITED BASIS.**

Reference is made to a notice from J.P. Morgan Trustee and Depositary Company Limited (**"JPMTDL"**) dated 7 August 2006 advising the holders of the Notes (the **"Noteholders"**) that JPMTDL reassumed the trusteeship for the Notes from Wells Fargo Bank, N.A. (**Wells Fargo**) with effect from 4 August 2006. Noteholders are hereby advised further that pursuant to an order of the High Court of England and Wales dated 3 April 2007 and effective as of 19 May 2007, The Bank of New York (the **"Trustee"**) has succeeded to all rights and obligations of JPMTDL as Trustee under the Trust Deed dated 27 July, 1993 (as amended and supplemented) between the Republic and JPMTDL constituting the Notes (the **"Trust Deed"**). All capitalised terms not otherwise defined herein shall have the meanings given to them in or pursuant to the Trust Deed.

The Trustee hereby confirms that as of the date of this notice each Series of the Notes outstanding under the Programme has been declared immediately due and payable by the Trustee or its predecessors. The Trustee or its predecessor, as the case may be, have made demand upon the Republic for immediate payment of all principal and interest due on each Series of Notes and have reserved all of rights of the Trustee and the Noteholders attaching to each Series of the Notes. The Republic has shown no intention of honouring the demands for payment made by the Trustee and its predecessors.

As was the position of its predecessors, the Trustee does not intend to take any action against the Republic to enforce the terms of the Trust Deed, the Notes and the Coupons, unless, pursuant to Condition 12 of the Notes, (a) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least 25 per cent. in nominal amount of the Notes of the relevant Series outstanding and (b) it shall have been indemnified to its satisfaction. The Trustee is advised that the clearings systems are no longer able to confirm the validity of any directions Noteholders may have provided to the Trustee's predecessors.

Noteholders who wish to direct the Trustee to bring an action against the Republic to enforce the terms of the Notes should contact the clearing system in which their Notes are held, or if applicable, their custodian, to cause the clearing system to block their holdings in the Notes from trading and send the Trustee a SWIFT message confirming the Noteholder's directions. Noteholders who hold their Notes through a DTC Participant must cause such DTC Participant to provide the Noteholder's directions to the Trustee via facsimile or post. Each direction to the Trustee must reference the relevant ISIN or CUSIP and the nominal amount of Notes to which the direction pertains and include, the account number and identity of the clearing system participant holding the Notes as well as the name and contact details of the beneficial holder of the Notes. Upon receipt of a valid direction, the Trustee shall in due course provide to the Noteholder giving such direction a copy of the Trustee's standard form deed of indemnity.

Noteholders who have questions concerning the information contained in this Notice may contact the Trustee at the following address:

> One Canada Square
> London E14 5AL
> Attn: CT-Corporate-Sovereign Unit
> Telephone: +44 (0) 20 7964 8781/8791
> Facsimile: +44 20 7964 2530

29 May 2007                                    The Bank of New York, as Trustee

*No representations are made as to the correctness or accuracy of any ISIN contained herein. ISINs are included herein solely for the convenience of Holders.*